FILED

2022 May-19  AM 11:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**GARY LEE MCCORMICK,**    )
                     )
    **Plaintiff,**       )
                     )   Civil Action Number
**v.**                    )   **2:20-cv-01781-AKK**
                     )
**HARDY CORPORATION,**    )
                     )
    **Defendant.**     )

## MEMORANDUM OPINION

Gary Lee McCormick maintains that his former employer, Hardy Corporation, discriminated against him based on his race in violation of Title VII. Hardy moves for summary judgment, contending that McCormick does not plead facts to support a hostile work environment claim, that he does not cite similarly situated employees to support his *prima facie* case for discriminatory discharge, and that Hardy in fact discharged him for failing to timely report to certain job sites.  *See* doc. 15-8.  McCormick, who sues *pro se*, did not respond to Hardy's motion. Having reviewed the motion, the evidence, and the law, the court agrees with Hardy that summary judgment is due.

## I.

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56.   Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The movant bears the initial burden of proving the absence of a genuine issue of material fact.   *Id*. at 323.   Then, the burden shifts to the nonmoving party, who must establish a "genuine issue for trial," *id*. at 324 (internal quotations omitted), meaning "that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

At summary judgment, the court construes the evidence and reasonable inferences arising from it in the light most favorable to the nonmovant.   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).   However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."   *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## II.

McCormick worked on and off for Hardy, a mechanical contracting company in Birmingham, Alabama, from 2012 through 2020 as a laborer and a welder.   *See* docs. 4 at 9; 15-2 at 2; 15-8 at 4.   When he re-applied to work for Hardy in 2014, he confirmed he would be willing to travel to different locations for Hardy projects

at all times.   *See* doc. 15-2 at 12.   To facilitate this travel, Hardy supervisors would call or text McCormick about where and when to report to different job sites.   Doc. 15-8 at 4.

In February 2020, Tommy Cox, Hardy's director of operations, instructed McCormick to report to a project in Charlotte, North Carolina, in early March.   *Id.* at 4; docs. 4 at 11; 15-3 at 3.   McCormick told Cox that he needed to stay in town to help care for his mother, but Cox apparently told McCormick that he had to show up in Charlotte or else risk his job.   Doc. 4 at 11.   McCormick says that a younger white employee also told Cox he would not go to Charlotte and that Cox did not similarly threaten to discharge him.   *Id.*

McCormick failed to report to Charlotte on his scheduled start date, and he later explained to Cox that he did not have money for gas to make the trip.   Docs. 15-3 at 3; 15-8 at 4–5.   In response, Cox told McCormick that going forward, McCormick had to let his supervisors know in advance if he could not make it to a job site, and Cox arranged to advance McCormick's pay.   Doc. 15-3 at 3. McCormick then presented at the Charlotte job site three days late.   *Id.*   Cox avers that McCormick was the only employee who did not show up as instructed even though Hardy could have advanced McCormick his pay sooner if he had notified Cox beforehand.   *Id.*

In April 2020, a Hardy supervisor assigned McCormick to a job site in Atlanta and told him that Cox would handle McCormick's accommodations for his hotel there.   Docs. 4 at 11–12; 15-3 at 3–4; 15-8 at 4.   The supervisor provided McCormick with the address for the Atlanta job, doc. 4 at 12, and Hardy administrative personnel reserved McCormick a hotel room to begin the night before his start date, docs. 15-3 at 4, 8; 15-8 at 6.   However, McCormick did not appear at the Atlanta project as scheduled.   Docs. 4 at 12; 15-3 at 4; 15-8 at 7.   McCormick contends that he did not show up because he did not receive his hotel information and could not reach his supervisors.   Doc. 4 at 12.   However, McCormick also testified that he did not call his supervisors that weekend and that Cox called him on Monday morning about his failure to report to the Atlanta project.   Doc. 15-2 at 26. When Cox called McCormick that morning and learned he had not driven to Atlanta, Cox told him this was "unacceptable" and that Hardy needed dependable workers who would show up as instructed.   Doc. 15-3 at 4.

Soon after, Cox discharged McCormick.   *Id.* at 5; doc. 4 at 13.   Although McCormick says that he lost his job "for 'various reasons,'" doc. 4 at 13, Cox says that he discharged McCormick "[b]ecause of the lack of reliability and refusal to take the initiative and responsibility to communicate so that [Hardy] could ensure [it] had a fully staffed work crew, demonstrated by [McCormick's] back-to-back failures to report to the job-sites as directed . . . . ," doc. 15-3 at 5.   Cox says that his

4

decision "was based exclusively on [his] loss of confidence in Mr. McCormick as an employee [he] could rely on to report for work when assigned and not leave [Hardy] shorthanded, as he did on the consecutive [Charlotte] Job and Atlanta Job." *Id.* McCormick's separation notice provides "[d]oes not take initiative to insure [sic] he is on the jobs as directed when needed" and "[a]lways had an excuse of why he is not there" as the "reason for termination." *Id.* at 9.

McCormick asserts that during his employment with Hardy, he "witnessed several racist remarks made towards African Americans, including displays of Confederate flags and the use of racial expletives by [his] Caucasian coworkers." Doc. 4 at 9, 13. McCormick, who is African American and was 40 years old at the time of filing his EEOC charge, also maintains that "younger coworkers were treated comparatively better than [him], and [Hardy] hired more young workers than older ones." *Id.* He also says that Hardy "randomly selected [him] for three drug tests over the course of two months" and that he reported this to Hardy's human resources department because he believed he "was being targeted." *Id.* According to McCormick, he also reported his coworkers' racist comments to HR, but HR never informed him of the steps it took, if any, in response. Doc. 15-8 at 11. For its part, Hardy claims that it investigated the offending employee, placed him on probation, required him to attend training, and instructed him that further incidents would result in his discharge. *See id.* at 11–12. Hardy also asserts that it randomly drug tests

5

its field and shop employees each month using a number generator, *see id.* at 12, and that two white employees and McCormick had two randomly selected drug tests during the relevant timeframe, *id.* at 13–14.

After filing an EEOC charge, McCormick filed this lawsuit against Hardy and several of its employees for race and age discrimination in violation of Title VII and the Age Discrimination in Employment Act.   *See* doc. 1.  Following the court's order to amend the pleadings, doc. 3, McCormick dropped the individual defendants, doc. 4, and the court dismissed his age-discrimination claims, doc. 5.   Only McCormick's race-discrimination claim against Hardy remains.

## III.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee with respect to the "terms, conditions, or privileges of employment" because of the employee's race.   42 U.S.C. § 2000e-2(a)(1).   Liberally construing McCormick's *pro se* pleadings, *see Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998), the court reads McCormick's Title VII claim as twofold.   First, McCormick appears to claim that Hardy created a hostile work environment by, in part, failing to address racist incidents among its employees.   *See* doc. 4.   And second, McCormick suggests that Hardy discharged him because of his race.   *See id.*   In response, Hardy maintains that it took sufficient steps to address the complaint it received about the offending employee at

6

issue and that McCormick can neither make a *prima facie* case for discrimination nor rebut its legitimate reason for discharging him, *i.e.*, his failure to reliably report to work.   *See* doc. 15-8.

### A.

To establish a hostile work environment claim under Title VII, McCormick must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on [his] protected characteristic . . . , such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that [Hardy] is responsible for such environment under either a theory of vicarious or of direct liability.

*See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).   The harassing behavior must "result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that [McCormick] 'subjectively perceive[d] . . . to be abusive.'"[1]   *See id.* at 1276.   In effect, McCormick must allege and support the existence of a work environment "permeated with discriminatory intimidation, ridicule, and insult."   *See Wilkerson v. H&S, Inc.*, 438

---

[1] "In evaluating the objective severity of the alleged harassment, [the court] consider[s] the frequency of the conduct; its severity; whether the conduct was threatening or humiliating, or was instead an isolated offensive utterance; and whether the conduct unreasonably interfered with [McCormick's] performance."   *See Edgerton v. City of Plantation*, 682 F. App'x 748, 749 (11th Cir. 2017).

F. App'x 769, 770 (11th Cir. 2011) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002)).

Under these factors, and construed generously, McCormick's claim cannot proceed. McCormick alleges that while with Hardy, he "witnessed several racist remarks made toward African Americans," including the use of Confederate flags and racist epithets by coworkers. *See* doc. 4 at 9. He also testified that he verbally reported to HR overhearing racist comments or slurs by another employee. Doc. 15-2 at 15–16. His coworkers' alleged conduct is certainly reprehensible and, to say the least, inexcusable. With respect to the offending employee about whom Hardy received a formal complaint, Hardy asserts that it investigated the employee, placed him on probation, mandated that he attend training on racial harassment, and warned him that further complaints would result in his discharge. *See* doc. 15-8 at 12 (citing doc. 15-5 at 3).[2] McCormick has not responded to these contentions, and he testified that though he thought Hardy would have told him if it investigated the incident, Hardy could have acted without informing him. Doc. 15-2 at 16.

Even setting aside the timeliness of this claim (for which McCormick does not provide a timeframe), McCormick's allegations collectively do not amount to a

---

[2] Specifically, Wayne Mathews, Hardy's vice president of administration, avers that although Hardy has no record of McCormick reporting such an incident, it did receive a report from another employee about the use of racist slurs by a coworker in June 2019. Doc. 15-3 at 3. Mathews says that HR "immediately conducted an investigation" that led Hardy to impose probation, training, and counseling on the employee that month. *Id.*

workplace "permeated with discriminatory intimidation, ridicule, and insult."[3]   *See*

*Wilkerson*, 438 F. App'x at 770.   *See also Edgerton*, 682 F. App'x at 750.   As a

result, McCormick fails to support a hostile work environment claim, *see Miller*, 277

F.3d at 1275, and summary judgment is warranted on this claim.[4]

## B.

McCormick also maintains that Hardy discharged him because of his race.

To succeed at this stage, McCormick must point to evidence showing that his

discharge was the product of discrimination.   "[McCormick] can do so in a variety

of ways, one of which is by navigating the now-familiar three-part burden-shifting

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973)."   *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1217

(11th Cir. 2019) (internal citation partially omitted).[5]   Under this framework,

---

[3] Likewise, McCormick fails to establish Hardy's liability for the allegedly hostile environment. "Where the perpetrator of the harassment is merely a co-employee of the victim," as McCormick claims here, "the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller*, 277 F.3d at 1278.   Hardy acknowledges that it received a report about the offending employee, but it also asserts that it immediately investigated the employee before reprimanding, counseling, and warning him about future misconduct.   *See* doc. 15-3 at 3.

[4] Similarly, although McCormick cites his belief that Hardy discriminatorily targeted him for drug screenings, *see* doc. 4 at 9, Hardy provides evidence that it uses a random number generator to select employees for drug tests and that it randomly selected three employees—McCormick and two white coworkers—for two drug tests in the relevant time period, *see* doc. 15-5 at 2–3. McCormick does not provide evidence to rebut this and cannot show a hostile work environment on this basis.

[5] McCormick could also use direct evidence to make a case of discriminatory discharge, but he has not done so.   As the court discusses, McCormick later testified that he does not think Cox discharged him because of his race, *see* doc. 15-2 at 30—an admission that may independently

McCormick must first establish a *prima facie* case of discrimination, at which point the burden shifts to Hardy to provide a legitimate, nondiscriminatory reason for discharging him.   *See Walker v. Mortham*, 158 F.3d 1177, 1183–84 (11th Cir. 1998).   Should Hardy carry this burden, McCormick must demonstrate that the proffered reason "was merely a pretext for unlawful discrimination."   *Lewis*, 918 F.3d at 1221.

As a threshold matter, Hardy asserts that McCormick's deposition testimony "categorically precludes his Title VII claim" because McCormick "den[ied] any basis to believe that Tommy Cox's decision to terminate his employment with Hardy was racially motivated."   Doc. 15-8 at 16 (citing doc. 15-2 at 30).   Additionally, Hardy contends that McCormick cannot establish a *prima facie* case because he fails to provide similarly situated individuals whom Hardy treated differently and that, regardless, Hardy articulated and McCormick does not dispute that his failure to report to consecutive job projects led to his discharge.   *See* doc. 15-8 at 21–23.

1.

The Eleventh Circuit has held that an employee's concession that she did not think her discharge "had anything to do with her race" waived her racial discrimination claim and entitled her employer to summary judgment.   *See Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 661 (11th Cir. 2012) (internal

doom this Title VII claim.

punctuation omitted).   *See also Peters v. HealthSouth of Dothan, Inc.*, 642 F. App'x
782, 787 (11th Cir. 2013) (holding the same).   Thus, the court turns to McCormick's
testimony to determine whether he conceded that race did not factor into his
discharge, as Hardy maintains.   At McCormick's deposition, the relevant exchange
went as follows:

> Q: Mr. McCormick, do you think that Tommy Cox fired you because
> of your race?
>
> A: I never said that.
>
> Q: You don't agree with that?
>
> A: No, I never said that.
>
> Q: You've never said that?
>
> A: No.
>
> Q: Sir?
>
> A: I can't remember.
>
> Q: No, do you think he fired you because of your race?
>
> A: I don't know.

Doc. 15-2 at 30.

This testimony does seem to illustrate McCormick's admission that he does
not maintain that Hardy, through Cox, discharged him based on his race.   *See id.*
The court agrees with Hardy that this testimony alone could entitle Hardy to
summary judgment on McCormick's discharge-based claim.   *See Ross*, 701 F.3d at
661.   However, because McCormick has not had the benefit of counsel and did not

11

respond to Hardy's motion, and for the sake of completeness, the court will consider

Hardy's remaining contentions with respect to the discriminatory discharge claim.

2.

Under the *McDonnell-Douglas* framework,

> the plaintiff bears the initial burden of establishing a *prima facie* case
> of discrimination by showing (1) that she [or he] belongs to a protected
> class, (2) that she [or he] was subjected to an adverse employment
> action, (3) that she [or he] was qualified to perform the job in question,
> and (4) that her [or his] employer treated 'similarly situated' employees
> outside her [or his] class more favorably.

*Lewis*, 918 F.3d at 1220–21.   Thus, "[McCormick] bears the initial burden of

establishing a *prima facie* case of discrimination by proving, among other things,

that [he] was treated differently from another 'similarly situated' individual—in

court-speak, a 'comparator.'"   *See id.* at 1217 (quoting *Tex. Dep't of Cmty. Affairs

v. Burdine*, 450 U.S. 248, 258–59 (1981)).   This, in turn, requires McCormick to

demonstrate that he and his "proffered comparators were 'similarly situated in all

material respects.'"   *Id.* at 1218.

McCormick does not cite evidence of coworkers who are not African

American and whom Hardy did not discharge following a similar pattern of failing

to appear at job sites on time.[6]   Further, Cox avers that McCormick was the only

---

[6] McCormick does claim that, at least with respect to the Charlotte project, Cox threatened to
discharge McCormick if he did not show up while simultaneously showing leniency to a younger,
white employee who also told Cox he did not want to go to Charlotte.   *See* doc. 4 at 9.   However,
McCormick does not assert that this employee likewise (1) confirmed in his job application that
he would travel for any Hardy project, (2) actually did not go to Charlotte on time, or (3) failed to

12

Hardy employee who failed to appear at the Charlotte and Atlanta job sites as instructed, doc. 15-3 at 3, 4, and McCormick has not responded to rebut this evidence or any of these contentions.   As a result, McCormick fails to establish a *prima facie* case of discrimination, and Hardy's motion is due to be granted on this ground.

3.

Moreover, even if McCormick could establish a *prima facie* case of discriminatory discharge, Hardy has met its burden of supplying a "legitimate, nondiscriminatory reason" for discharging him: his undisputed failure to timely report to two consecutive job sites.   *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).   Indeed, McCormick acknowledged that he did not show up on time to the Charlotte and Atlanta projects, *see* doc. 15-2 at 19–20; his "separation notice" lists "[d]oes not take initiative to insure [sic] he is on the jobs as directed when needed" and "[a]lways had an excuse of why he is not there" as McCormick's "reason for termination," doc. 15-3 at 9; and Cox avers that McCormick's unreliability directly led Cox to discharge him, *see id.* at 5.   This evidence, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of" McCormick's discharge.   *See Hicks*, 509 U.S. at 507.

Accordingly, the burden shifts to McCormick to demonstrate that Hardy's

report to other job sites on time.  Additionally, Hardy maintains that it discharged McCormick because of McCormick's back-to-back absences, not, for instance, for telling Cox that he did not want to or could not go to Charlotte.

proffered reason "was not the true reason for the [discharge], and that race was." *See id.* at 507–08 (internal citation omitted).   As noted, McCormick has not disputed that he failed to show up in Charlotte and Atlanta on his scheduled start dates.   *See, e.g.*, doc. 15-2 at 19–20.   And McCormick did not respond to Hardy's motion, leaving its contentions further unrebutted.   As a result, summary judgment is due on McCormick's discriminatory discharge claim on this ground as well.

## IV.

To close, Hardy's motion, doc. 15, is due to be granted because McCormick fails to establish that Hardy created a hostile work environment or discharged him because of his race in violation of Title VII.   A separate order follows.[7]

**DONE** the 19th day of May, 2022.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE

---

[7] Shortly after the discovery period closed, McCormick asked the court to place the parties on its discovery calendar for a conference regarding Hardy's allegedly tardy discovery responses. However, when the court instructed McCormick to confer with Hardy's counsel to select a mutually agreeable date, he did not respond to this message or to the court's follow-up.   Because McCormick failed to follow the court's discovery procedures, doc. 12 at 19–21, and ignored the court's inquiries, the court did not place the matter on its calendar.

14